# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BRIA-MARIE JAZZ SCOTT, | ) | CASE NO. 1:23-CV-01765-BMB |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | BRIDGET M. BRENNAN |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.       INTRODUCTION

Plaintiff, Bria-Marie Jazz Scott ("Ms. Scott"), seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF No. 1.) This matter is before me pursuant to 42 U.S.C. §§ 405(g) and Local Rule 72.2(b). (*See* ECF non-document entry dated September 12, 2023). For the reasons set forth below, I RECOMMEND that the Court VACATE and REMAND the Commissioner's final decision.

## II.      PROCEDURAL HISTORY

On June 15, 2020, Ms. Scott filed an application for DIB. (Tr. 215-216.)[2] She filed an application for SSI on September 30, 2020, relating to migraines, bipolar depression, and anxiety. (Tr. 205-09, 267.) The ALJ found that Ms. Scott has the severe impairments of PTSD, bipolar

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.
[2] The administrative transcript ("Tr.") appears at ECF No. 5 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record references are to the electronically stamped CM/ECF document ("ECF No.") and PageID# rather than any internal pagination.

1

disorder, ADHD combined type, and migraines. (Tr. 21.) Ms. Scott's application was denied initially and upon reconsideration. (Tr. 75-94, 97-105.)

An administrative law judge ("ALJ") held a hearing on June 14, 2022, where Ms. Scott, represented by counsel, and a vocational expert ("VE") testified. (Tr. 50-72.) At the administrative hearing, the ALJ explained that the hearing would be 45 minutes in length, with 15 minutes allotted to the claimant's testimony. (Tr. 55.) Because Ms. Scott's counsel did not have time to elicit testimony regarding Ms. Scott's migraines within the allotted 15 minutes, counsel orally moved for a supplemental hearing to provide additional testimony about Ms. Scott's migraines. (Tr. 67.) The ALJ denied this request at the hearing, stating that the migraine information Ms. Scott listed and the record was "more than adequately detailed" to supplement what was already in the record. (*Id.*)

The ALJ issued a written decision on September 30, 2022, finding that Ms. Scott was not disabled within the meaning of the Social Security Act. (Tr. 17-44.) The Commissioner's decision became final, when the Appeals Council declined further review on July 10, 2023. (Tr. 1-6.) Ms. Scott filed a Complaint on September 11, 2023, challenging the Commissioner's final decision. (ECF No. 1.) She raises the following assignments of error:

(1) The ALJ committed harmful error when she deprived Plaintiff of due process by stopping the questioning without allowing Plaintiff to present the totality of her evidence.

(2) The ALJ erred when she failed to properly evaluate Plaintiff's headaches at Step Three of the Sequential Evaluation.

(3) The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

(4) At Steps Four and Five of the Sequential Evaluation, the ALJ's RFC finding that Plaintiff could perform her past relevant work was not supported by substantial evidence.

(ECF No. 6, PageID#1371.)

### III.    BACKGROUND

#### A.  <u>Personal, Educational, and Vocational Information</u>

Ms. Scott was born in 1993. (Tr. 205.) She has an associate's degree of arts. (Tr. 977, 1347.) Her past relevant work was employment as a teacher's aide, sandwich maker, hospital food service worker, and cafeteria attendant. (Tr. 43.)

#### B.  <u>Relevant Non-Medical/Medical Opinion Evidence</u>

##### 1.  *State Agency Opinions*

###### a.  **Medical Consultants**

In April 2021, Leon Hughes, M.D., reviewed the case file at the initial level of consideration. Dr. Hughes determined that insufficient evidence existed in the file regarding Ms. Scott's migraines. (Tr. 77.) Dr. Hughes noted that Ms. Scott did not respond to multiple contact attempts regarding a consultative examination. (*Id.*)

In December 2021, Rannie Amiri, M.D., reviewed the file at the reconsideration level. Dr. Amiri determined that Ms. Scott could perform work at the medium exertional level except she could never climb ladders, ropes, or scaffolds, and should avoid all exposure to hazards. (Tr. 101-02.) Dr. Amiri cited Ms. Scott's history of migraines with no clear neurological outpatient follow-up and a normal neurological examination during a psychiatric admission as support. (*Id.*)

### b.  Psychological Consultants

In April 2021, Jaime Lai reviewed the case file at the initial level of consideration. Dr. Lai determined that the file contained insufficient evidence. (Tr. 78.) Dr. Lai further noted that Ms. Scott was non-responsive regarding a consultative examination. (*Id.*)

In December 2021, Karla Delcour, Ph.D., reviewed the file at the reconsideration level. Dr. Delcour determined that Ms. Scott had no limitation in understanding, remembering, or applying information, but she had moderate limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 100.) Dr. Delcour determined that Ms. Scott could carry out one-to-four-step tasks in which duties are routine and predictable and with no demands for fast pace or high production. (Tr. 103.) Dr. Delcour further determined that Ms. Scott could have superficial interaction with coworkers and supervisors, occasional interaction with the general public, and no exposure to crowds. (*Id.*) Finally, Dr. Delcour determined that Ms. Scott could adapt in settings where duties are routine and predictable. (*Id.*)

### 2.  *Jennifer Slattery, LISW-S*

In November 2021, Ms. Slattery wrote the following letter on Ms. Scott's behalf:

[Ms. Scott] has demonstrated difficulty maintaining employment. She has had many part time jobs where she is unable to sustain the energy, structure and emotional regulation necessary to maintain employment. Her depressive s[ymptoms] worsen with sustained stress and compound her ability to show up on time and maintain concentration and she often flees the work environment for the safety of home. [Her] history of interpersonal abuse causes her to have reactive stress to her coworkers and has difficulty accepting direction and criticism and finds herself in conflict with her coworkers. [She] has and will continue to have difficulty sustaining full or part time employment due to her mental health symptoms.

(Tr. 871.)

### C.  Relevant Medical Evidence

#### 1.  *Migraine Headaches*

Ms. Scott reported that she had a history of migraine headaches at an August 26, 2019, intake interview for a partial hospitalization program at Highland Springs Hospital. (Tr. 352.) Ms. Scott further reported at a January 3, 2020, counseling appointment, that she returned to work and her migraines were less intense and debilitating. (Tr. 568.)

On February 3, 2020, Ms. Scott reported an onset of migraine headaches during high school and said that these headaches became more severe in her late teens and early twenties. (Tr. 500.) She also reported that the migraines could last "days without treatment." (*Id.*) She experienced about 10 migraines month, although she reported that she "can get good relief within an hour, sometimes, but Excedrin [was] becoming less effective." (*Id.*) Ms. Scott described her migraines as throbbing and pounding behind one eye or both eyes into her temples, forehead, and back of the head. (*Id.*) While she did not experience an aura, she reported photophobia, phonophobia, and nausea. (*Id.*) She confirmed that Excedrin helped relieve her symptoms. (*Id.*) The only trigger she could identify was "[m]aybe weather changes." (*Id.*) She had no ER visits or hospitalizations for migraines in the previous year. (*Id.*) She was headache pain free 23 days in the past month and used PRN medication eight times in the past month to treat her migraines. (Tr. 501.)

The "Review of Systems" section of the treatment notes' pertinent findings related to her migraines and physical functioning noted normal sleep, variable mood, normal stress, no known musculoskeletal problems, and no history of blood disorders. (Tr. 502.) A neurological examination was unremarkable, including findings that Ms. Scott was alert and oriented times three and attentive. (Tr. 503.) She had unremarkable thought process and content. (*Id.*) She followed commands appropriately and her speech was fluent. (*Id.*)

Pharmacological management notes from April 7, 2020, indicated that Ms. Scott's migraines had reduced with less stress. (Tr. 931.) On May 26, 2020, Ms. Scott reported that her migraines had significantly improved since she was laid off from her job in March 2020, and that her migraine headache days reduced from 10 days per month to three days per month. (Tr. 497.) Ms. Scott also indicated that there were five days in the last month where she experienced migraine headaches that limited her activities of daily living. (Tr. 498.) She further reported that she was headache pain free for 23 days the last month and used PRN medication eight times in the past month to treat her migraines. (Tr. 497.) She sought medication for ADHD, but her psychiatrist did not want to prescribe it due to concerns it would worsen her migraines. (*Id.*) Eric Baron, DO, advised Ms. Scott that normally he did not prescribe the type of medication she was taking, nor did he treat ADHD. (*Id.*) Dr. Baron also noted that Ms. Scott's migraines were not expected to worsen with ADHD medication, but if it did then her treatment plan would be adjusted. (*Id.*)

On May 24, 2021, Ms. Scott met with Dr. Baron regarding her migraines. (Tr. 1326). Dr. Baron described Ms. Scott's migraines as "not intractable," meaning they were responsive to treatment. (*Id.*) Dr. Baron prescribed Nurtec and dietary supplements; he also cautioned Ms. Scott not to use over-the-counter medications more than 10 days each month. (Tr. 1327.)

At a September 2, 2021, admission for mental health impairments, Ms. Scott reported to Kathryn Grenfell, PA-C that she had a chronic health condition of migraine headaches. (Tr. 769.) On May 10, 2022, Ms. Scott attended a follow-up virtual visit regarding her headaches. She reported a headache with pressure and throbbing in the occipital area with associated symptoms of photophobia, phonophobia, nausea, and neck pain. (Tr. 1140.) She said that these migraine symptoms worsened with activity. (*Id.*) She also reported 10 migraine headache days per month. (*Id.*) She stated that her headaches lasted 48 hours with treatment. (*Id.*) She reported that her

triggers were weather changes, too little sleep, food, and stress. (*Id.*) She did not experience an aura but did have allodynia. (*Id.*) She reported that she missed six days of work due to her migraines. (*Id.*) PA Grenfell noted later in this treatment note that she intended to get a preauthorization for Ms. Scott to use Fremanezumab.[3] (Tr. 1144.) PA Grenfell opined that Ms. Scott's migraine headaches met the American Headache Society criteria for treatment with this injection because Ms. Scott has "[e]pisodic [m]igraine[s] which occurs up to 14 days a month for 4 or more hours." (*Id.*) PA Grenfell specifically noted that Ms. Scott "has 10 migraines per month, lasting 4 or more hours[] associated with photophobia, phonophobia, nausea, neck pain for three or months." (*Id.*)

PA Grenfell wrote a letter regarding Ms. Scott on May 11, 2022. PA Grenfell wrote that Ms. Scott had been diagnosed with "episodic" migraines and was receiving treatment at Cleveland Clinic's Center for Neurological Restoration Headache Center. (Tr. 916.)

### 2. *Mental Health Impairments*

On August 26, 2019, Ms. Scott was admitted to Highland Springs Hospital's partial hospitalization program for treatment of depression and anxiety. (Tr. 351-353.) Ms. Scott reported several symptoms, including decreased concentration and memory, at the initial intake interview; however, she did not exhibit any of these issues during the interview. (Tr. 351.) She admitted to smoking marijuana a few times a week. (Tr. 351-53.) She also reported a history of migraine headaches. (Tr. 352.) Upon mental status examination, Ms. Scott presented with good grooming, hygiene, and eye contact. (Tr. 353.) Ms. Scott described her mood as depressed and anxious, and she displayed restricted affect. (*Id.*) However, Ms. Scott's speech, thought processes, and

---

[3] Fremanezumab, sold under the brand name Ajovy, is a prescription injection medication used for the preventive treatment of migraines in adults. *See Fremanezumab-Vfrm (Subcutaneous Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/fremanezumab-vfrm-subcutaneous-route/side-effects/drg-20443994?p=1, (last visited July 8, 2024).

associations were normal. (*Id.*) She endorsed passive thoughts of suicide but denied active suicidal and homicidal ideation, delusions, and hallucinations. (*Id.*) She was alert and fully oriented with normal memory and intelligence, good attention and concentration, and fair judgment and insight. (Tr. 353.) She admitted to only intermittent medication compliance and agreed to resume her medications of Wellbutrin and Latuda. (Tr. 352-53, 355.)

During the course of her three-week program at Highland Springs, Ms. Scott weaned off Wellbutrin because she felt it exacerbated her anxiety. (Tr. 355, 408.) She admitted at times to poor medication compliance. (Tr. 397.) During group therapy, Ms. Scott sometimes presented with passive suicidal ideation (Tr. 365); depressed, anxious, and/or manic mood; blunted, flat, and/or tearful affect (Tr. 363-66, 370, 375, 378, 391, 393, 396-97, 402, 412, 414, 417-20, 423); guarded, withdrawn, and/or hyperactive behavior (Tr. 375); and/or deflecting, rationalizing, catastrophizing, or negative self-talk. (Tr. 378, 398, 408-10, 421.) However, Ms. Scott on most occasions exhibited neutral, bright, curious, and/or insightful mood and congruent affect. (Tr. 359-62, 367-69, 372-74, 377, 384-85, 388-90, 394-95, 397-401, 403-11, 413, 415, 421-22, 424-29, 431-33.) With the exception of one therapy session where she appeared focused on outside issues (Tr 397), Ms. Scott was consistently attentive (Tr. 359-70, 372-75, 377-78, 383-91, 393-415, 417-33). At discharge, Ms. Scott endorsed only mild depression and no anxiety. (Tr. 356.) Her mental health provider rated Ms. Scott as psychiatrically stable with no functional impairments. (*Id.*) Ms. Scott agreed to enter the hospital's intensive outpatient program for further symptom management. (Tr. 356.)

Ms. Scott saw Deana Couture, PA, for medication management from October 2019 to January 2020. (Tr. 509-531.) In October 2019, Ms. Scott reported to PA Couture that her depressive symptoms were worse after discontinuing Wellbutrin, but her anxiety had improved.

(Tr. 513, 517.) Her mental status examination showed that she was alert and oriented with good hygiene and fair to poor eye contact. (Tr. 515, 518.) She presented with a depressed mood with thoughts of death (Tr. 515) and blunt affect (Tr. 518), though her speech, thought content, thought processes, cognition, insight, and judgment were normal (Tr. 515, 518). PA Couture made several medication adjustments in October 2019, including changes in Ms. Scott's dosage of Latuda and the addition of Viibryd. (Tr. 516, 518.)

In November 2019, Ms. Scott reported a 70 percent improvement in her depressive symptoms. (Tr. 521.) In December 2019, Ms. Scott reported increased migraines, which she attributed to Viibryd. (Tr. 524.) However, she reported improvement in her anxiety and resolution of her depression. (Tr. 524, 528, 531.)

At a therapy appointment on January 3, 2020, Ms. Scott reported chronic anxiety over her financial situation. (Tr. 568.) Ms. Scott's counselor noted that Ms. Scott continued to exhibit low mood and blunted affect. (*Id.*) On January 9, 2020, Ms. Scott reported that she was continuing to struggle with managing her finances as a result of calling off work due to her migraines. (Tr. 569.) At a January 14, 2020, appointment, Ms. Scott admitted to missing some doses of Viibryd, which resulted in mood lability; she also admitted to missing a neurology appointment for a migraine evaluation. (Tr. 528.) Ms. Scott asked whether there was a possibility that some of her symptoms were attributable to ADHD, *e.g.,* issues with distraction, staying on task and completing tasks, difficulty keeping schedule, and lack of attention to detail. (Tr. 529, 532.) However, other than some notations of dysthymia, anxiety and/or blunted affect, Ms. Scott's mental status findings were normal at her office visits. (Tr. 522, 525, 529, 532.) PA Couture adjusted Ms. Scott's medication again and added a medication to address Ms. Scott's migraines and mood issues. (Tr. 525, 528, 531.)

Ms. Scott canceled a counseling appointment on January 16, 2020, due to a migraine. (Tr. 570.) On January 30, 2020, Ms. Scott reported she felt less depressed and more energetic. (Tr. 572.) She further reported that she has had intense mood lability since childhood, with moods ranging from extreme sadness to extreme happiness. (Tr. 572.) At a counseling appointment on February 4, 2020, she reported an improving mood but wondered if it resulted from hypomania. (Tr. 573.) She reported an improved mood on February 13, 2020, though she expressed concern that she was annoying, which triggered feelings of guilt, shame, and depression. (Tr. 574.) Christine Lalich, LISW, noted that Ms. Scott "chronically lives in her thoughts" and has extreme difficulty being present, which seemed to be contributing to Ms. Scott's experienced dissonance. (*Id.*) She noted that Ms. Scott wants to present a certain way but is unable to do so because she feels out of control and disconnected to herself. (*Id.*)

At medication management visits in February 2020 and March 2020, Ms. Scott reported increased depressive symptoms but stable anxiety. (Tr. 924, 928.) She also mentioned an increase in the number (but not in the intensity) of her headaches after her primary care provider reduced her dosage of Topamax. (Tr. 924.) Besides a dysthymic and anxious, restless mood, blunt affect, and subjective complaints of attention issues, Ms. Scott's mental status was within normal limits at both visits. (Tr. 925, 929.) PA Couture noted that Ms. Scott's responses to a screening questionnaire suggested that ADHD was highly likely; however, Ms. Couture considered stimulant medication inappropriate because of Ms. Scott's migraines. (Tr. 926.)

In March and April 2020, Ms. Scott continued counseling with Ms. Lalich. (Tr. 579-86.) On March 31, 2020, Ms. Scott reported she was laid off at work due to COVID-19. (Tr. 582.) She stated that she was staying busy with activities and hobbies. (Tr. 583, 585-86.) Ms. Lalich noted that Ms. Scott's mood was "stable and appropriate." (Tr. 583.) Ms. Scott reported at an

appointment on April 14, 2020, that she was constantly anxious, worried about what other people think of her, on guard, and hypervigilant. (Tr. 585.) Ms. Lalich noted that Ms. Scott's mood was "stable and appropriate." (*Id.*)

On June 9, 2021, Ms. Scott sought voluntary admission to Highland Spring Hospital's partial hospitalization program for treatment of her bipolar depression and occasional binge drinking. (Tr. 590.) She reported worsening depression over the last few weeks or months. (Tr. 590, 684.) Upon mental status examination, Ms. Scott was cooperative and presented with good grooming. (Tr. 592, 598, 600.) She described her mood as depressed and anxious, but she displayed a full affect. (Tr. 592.) Although Ms. Scott endorsed passive thoughts of suicide, she denied active suicidal and homicidal ideation, delusions, and hallucinations. (Tr. 591-93.) She exhibited poor to fair judgment and insight, but she was alert and fully oriented with intact associations, normal memory, thought processes, and intelligence, and good attention and concentration. (Tr. 592-93.) She admitted to inconsistently taking prescribed medications and agreed to resume Latuda, Vistaril, and Prozac. (Tr. 592-93, 597, 632.)

Over the course of her three-week partial hospitalization program, NP Kevin Atwell discontinued Latuda and added Risperdal. (Tr. 594, 603.) During therapy and educational sessions, Ms. Scott sometimes exhibited a depressed, hopeless, anxious, aggravated, irritable, frustrated, labile, restless, and/or disappointed mood, as well as a blunted, flat, and/or sad affect. (Tr. 632, 645-47, 652-53, 656-57, 659-661, 663, 671, 674.) She was consistently attentive. (Tr. 630-36, 641-75.) She also admitted during some sessions to symptom improvement. (Tr. 635, 641, 664.) At discharge, Ms. Scott endorsed a mild improvement in mood, and NP Atwell noted no safety concerns. (Tr. 603.) At that time, a mental status examination revealed that Ms. Scott was depressed and anxious with poor to fair judgment and insight; however, her other findings were

11

normal. (Tr. 604.) Because Ms. Scott reported occasions when she experienced bursts of energy or anger, NP Atwell increased Risperdal; upon discharge, her medications were Hydroxyzine, Risperidone, and Fluoxetine. (Tr. 603, 601.) Ms. Scott agreed to participate in an intensive outpatient program for further symptom management. (Tr. 603.)

During her intensive outpatient program in July 2021 and August 2021, Ms. Scott sometimes presented with abnormal mood and affect. (Tr. 733-34, 736-42, 747-48, 750-52, 754-58, 760-61, 763, 765-66), but at other times she displayed a neutral, calm, content, hopeful, capable, bright, elevated, or energetic mood and congruent affect. (Tr. 721-24, 730-33, 735-37, 740, 749-53, 758-60, 762, 764.) Therapists described her behavior as cooperative and appropriate. (Tr. 721, 723-724, 731-732, 735, 737-738, 740, 742, 748, 756-757, 761-763, 766.) On a single occasion, Ms. Scott admitted to having passive suicidal ideations. (Tr. 721.). She was always engaged and attentive during sessions. (Tr. 690, 721-725, 730-742, 747-766.) On August 2, 2021, Ms. Scott indicated that she experienced decreased symptoms of depression. (Tr. 757.) Ms. Scott admitted at an August 2021 session to missing some doses of her medication. (Tr. 461.) At the time of discharge in early August, Ms. Scott's medications were Bupropion and Hydroxyzine. (Tr. 698.)

On July 6, 2021, Ms. Scott reported to Ms. Slattery that she found her intensive outpatient program helpful. (Tr. 31, 878.) Later that month, Ms. Scott reported improved mood and discussed finding an alternative psychiatric provider for ADHD medication with Ms. Slattery. (Tr. 879.) At the end of July 2020, Ms. Scott exhibited a depressed mood and blunt affect but stated that she was coping better and pursuing work more actively. (Tr. 880.)

On August 18, 2021, Ms. Scott saw PA Amanda Prince for an initial evaluation (Tr. 900). Ms. Scott reported her psychiatric history and stated that, with the exception of lack of focus, her

symptoms were under control. (Tr. 901.) Ms. Scott presented with an indifferent mood, flat affect, poor eye contact, and slowed speech (Tr. 903.) But her appearance, demeanor, thought content, thought processes, orientation, attention, memory, judgment, and insight were unremarkable. (Tr. 903.) PA Prince suggested that Ms. Scott undergo neuropsychological testing because she did not have a formal ADHD diagnosis and did not meet the full criteria for the disorder. (Tr. 903-904.) She encouraged Ms. Scott to continue taking a mood stabilizer pending the outcome of testing. (Tr. 877, 901, 903.) In August 2021, Ms. Scott continued seeing Ms. Slattery. (Tr. 881-883.) Ms. Scott reported that she was in a "lethargy cycle" and presented in early August 2021 with a depressed mood and blunt affect. (Tr. 881.) In mid-August 2021, Ms. Scott appeared depressed and reported some attentional issues and dissociation. (Tr. 882-883.) Ms. Slattery referred Ms. Scott to ARC Psychiatry for a second opinion regarding ADHD. (Tr. 882.)

From mid-August 2021 to late August 2021, Ms. Scott saw Ms. Lalich for mental health counseling. (Tr. 898-99, 905-06.) Mental status exams revealed an anxious mood, constricted affect, and lethargy. (Tr. 899, 906.) Her speech, behavior, thought content, perception, orientation, insight, and judgment were unremarkable. (Tr. 899, 906.)

On September 2, 2021, Ms. Scott entered at Highland Springs Hospital as an inpatient after reporting worsening bipolar symptoms and thoughts of suicide. (Tr. 768.) A mental status examination revealed that Ms. Scott was casually dressed and groomed, with an anxious mood. (Tr. 769.) Her orientation, speech, thought processes, associations, memory, attention, concentration, judgment, and insight were unremarkable. (Tr. 769-770.) She reported taking Lamictal and Wellbutrin, but the medical record indicated she was non-compliant at the time of admission (*Id*.) Ms. Scott's mental status varied during her stay, with findings of depressed and/or anxious mood, flat or blunted affect, excessive talking, negative attitude, and/or occasional

guarded, avoidant, or withdrawn behavior and thoughts of self-harm (Tr. 819, 822, 825, 828-829, 832, 838, 840, 844-845, 847, 849-851, 854). At other times, however, she presented with a bright mood and congruent affect (Tr. 821, 823, 833-837, 839, 841- 842, 846, 852-853, 855-858). She routinely presented with good grooming and was calm, cooperative, pleasant, motivated, fully oriented, and made appropriate eye contact. (Tr. 819, 821-823, 825, 832-842, 844-846, 849, 852-855, 857-858.) Other than appearing preoccupied during sessions one day, the therapy notes indicated no issues with attention. (Tr. 828-829.)

Ms. Scott's discharge diagnoses were bipolar disorder and ADHD. (Tr. 788-789.) Plaintiff's provider made several medication adjustments and, upon discharge on September 15, 2021, Plaintiff's medications included Strattera, Neurontin, Lamictal, Zyprexa, Desyrel, Wellbutrin, and Vistaril. (Tr. 788, 790-791.) Other than anxious affect, Ms. Scott's mental status was normal at discharge. (Tr. 788). She received a referral to Frontline Service's crisis stabilization unit. (Tr. 1049.)

During a September 15, 2021, assessment at Frontline Service, Ms. Scott reported passive suicidal ideation. (Tr. 1050.) Ms. Scott also reported issues with attention and concentration. (Tr. 1054-55.) The mental status examination findings revealed mildly impaired judgment and insight, but all the other findings were normal. (*Id.*) At a September 27, 2021, appointment with Ms. Lalich, Ms. Scott had anxious and/or depressed mood and constricted affect. (Tr. 896.) Ms. Lalich also noted that Ms. Scott demonstrated lethargic behavior. (*Id.*) However, Ms. Scott was cooperative and engaged, with normal speech, perception, insight, and judgment. (*Id.*)

On October 7, 2021, Ms. Scott attended a mental health counseling appointment with Ms. Slattery. Ms. Scott reported improvement in her mood and said that her new job was going well.

(Tr. 885.) Ms. Scott reported some mild depression on October 28, 2021, but she also said she was coping better and her job was still going well. (Tr. 886.)

Ms. Scott continued to see Ms. Lalich for counseling from October 2021 to December 2021. (Tr. 888-94, 1121-28.) Mental status exams sometimes revealed an anxious mood, constricted affect (Tr. 889, 892), occasional monosyllabic or soft, slow speech (Tr. 889, 892, 1122, 1125, 1128), and lethargic behavior (Tr. 1122, 1125, 1128). There were, however, instances when Ms. Scott's mood, affect, speech, and/or behavior were within normal limits (Tr. 894, 889, 892, 894). Ms. Scott sometimes exhibited impaired judgment (Tr. 892), but on other occasions her judgment was appropriate (Tr. 889, 894). Her thought content, perception, and insight were routinely unremarkable. (Tr. 889, 892, 894, 1122, 1125, 1128.)

On January 19, 2022, Ms. Scott met with Monica Kommel, CNP. Ms. Scott reported that she was working 20 hours per week. (Tr. 944.) She also reported that she was not talking as fast as she did in the past. (*Id.*) She further reported that although she still gets anxious at the grocery store or the mall, it was not as "draining like it used to be." (*Id.*) She reported having high anxiety when trying to care of things such as searching for an apartment. (*Id.*) She reported high anxiety getting tasks done, which resulted in procrastination. (*Id.*) Upon mental status exam, Ms. Scott's mood was "mindful," and her affect was flat. (Tr. 953.) Ms. Scott's grooming, dress, behavior, orientation, speech, thought content, thought processes, associations, memory, cognition, fund of knowledge, insight, and judgment were within normal limits (Tr. 953.) NP Kommel adjusted Plaintiff's Hydroxyzine (Tr. 954).

On January 27, 2022, Ms. Scott underwent an ADHD evaluation with Alex Corcoran, MSSA, LISW-S. (Tr. 1344.) Ms. Scott described her history and symptoms and stated that her medication, Strattera, did not address her issues with focus and concentration. (Tr. 1344-1347.) A

mental status exam showed that Ms. Scott was tense but calm, attentive, and communicative (Tr. 1348). Ms. Scott had a depressed mood, indications of anxiety, and a short attention span. (Tr. 1348.) Her speech, language, thought processes, associations, cognitive function, insight, and judgment were normal. (*Id.*) Mr. Corcoran utilized the Brown Scales for ADHD, which reflected significant issues with activation, attention, affect, and memory. (Tr. 1349.) Mr. Corcoran recommend that Ms. Scott's prescribing medical source evaluate her for ADHD medication. (*Id.*)

At a follow-up visit with NP Kommel on April 12, 2022, Ms. Scott reported some ADHD symptom improvement; however, she admitted to taking Adderall in a single dose in the morning rather than splitting it between morning and afternoon (Tr. 1010). Plaintiff described her mood as depressed, less anxious, and "okay," and her affect was depressed (Tr. 1016). Her other mental status findings were unremarkable. (*Id.*) NP Kommel increased Ms. Scott's Adderall dosage and changed the frequency to once daily. (Tr. 1017.)

Ms. Scott followed up twice with NP Kommel in May 2022. (Tr. 1023-48.) Ms. Scott reported during a May 9, 2022, visit that things were going "fine" and she was better able to stay on task and manage her time. (Tr. 1023.) At a visit with NP Kommel on May 26, 2022, Ms. Scott reported that she had been having some depressive episodes. (Tr. 1036.) Her mental status examination findings were within normal limits at both visits. (Tr. 1029, 1042.)

At a June 1, 2022, appointment with Mr. Corcoran, Ms. Scott reported that she continued to struggle with work and had not attended her job for a few weeks. (Tr. 1334.) She reported that she had a recent appointment to meet with her boss, and she felt that this meeting had  not gone well. (*Id.*) Mr. Corcoran observed that Ms. Scott appeared somewhat downcast, but she was open to conversation and asked appropriate questions as needed for understanding. (*Id.*) She appeared forthright and honest and remained focused throughout the conversation. (*Id.*) Ms. Scott's mental

status examination revealed that she was alert and oriented, with good insight and downcast but stable mood (*Id.*) Mr. Corcoran noted that Ms. Scott was struggling with more feelings of depression due to troubles in the workplace. (*Id.*)

On June 3, 2022, Ms. Scott reported that she met with her boss and employment specialist, and she agreed to a plan where she could not be late or absent from work. (Tr. 1067.) Her mental status examination revealed that she had generally relaxed, engaged, and cooperative behavior, with neutral mood, appropriate affect, insight, and judgment, and unremarkable speech, thought content, and perception. (*Id.*)

On June 14, 2022, Ms. Scott met with Mr. Corcoran. She reported that recently returned to work and "struggles with harmony" in terms of relating to colleagues. (Tr. 1332.) The mental status examination revealed that Ms. Scott dressed appropriately for the weather and displayed no behavioral abnormalities. (*Id.*) Her mood was somewhat downcast, but Mr. Corcoran described Ms. Scott as engaged, forthright, open to conversation, and fully focused. (*Id.*) She was alert and oriented with congruent affect and good insight. (*Id.*) Mr. Corcoran categorized Ms. Scott's condition as stable. (*Id.*)

At a counseling appointment on July 14, 2022, Ms. Scott reported depression symptoms of hopelessness, worthlessness, fatigue, lack of motivation, and difficulty focusing. (Tr. 910). She also reported anxiety symptoms of uneasiness, restlessness, fearfulness, worry, poor concentration, muscle tension, headaches, and difficulty focusing. (*Id.*) She further reported that her mania caused restlessness, buying sprees, and increased talkativeness. (*Id.*) She also reported that she had panic symptoms of palpitations, trembling, and shortness of breath and trauma symptoms of nightmare, hypervigilance, and detachment. (*Id.*) Regarding her ADHD symptoms, Ms. Scott reported poor focus, trouble organizing, forgetfulness, losing things, trouble in school, and hyperactivity. (*Id.*)

However, Ms. Scott's mental status examination was normal. Specifically, she displayed neutral/euthymic mood and affect, appropriate demeanor, unremarkable thought content and perception, appropriate insight and judgment, and grossly intact memory. (Tr. 914.)

### D.  Relevant Hearing Testimony and Statements

#### 1.  *Ms. Scott's Function Report*

Ms. Scott reported that she has been diagnosed with bipolar type 2 disorder, migraines, and anxiety. (Tr. 287.) She stated that her migraines dramatically impact her ability to be present and perform well. (*Id.*) Specifically, she reported that her migraines resulted in issues at work including absences, tardiness, and leaving early, and she stated that this resulted in two terminations for attendance. (*Id.*) When she experiences a migraine, she feels like her eyes are going to "pop out of [her] head" and also experiences nausea, light sensitivity, and sound sensitivity. (*Id.*) When she takes medicine for her migraines, she reported that it works about 60% of the time and that the medication sometimes works within 30 minutes to two hours. (*Id.*) But she further explained that her migraine symptoms often grow worse even after taking medication. (*Id.*) When this happens, she must go home and sleep in a quiet and dark room. (*Id.*)

Ms. Scott also alleged that she has "paralyz[ing]" anxiety that prevents her from bathing or brushing her teeth if she does not leave the house. (*Id.*) She endorsed panic attacks. (*Id.*) She stated that she is very sensitive to criticism or scolding and avoids contact with her coworkers. (*Id.*) When she is manic, she tends to irritate people and finds it difficult to work with the public. (Tr. 290.) During anxiety attacks, she experiences dissociation that makes her feel like she is not in her body. (Tr. 292.)

Ms. Scott also reported that she requires reminders to take a shower. (Tr. 281.) Due to her conditions, she is not able to cook big meals very often, though she reported that she prepares

meals every day that do not require "heavy" cooking. (*See id.*) She is able to wash dishes a few times a week, but this task takes about 45 minutes. (*Id.*) She does her laundry three times a week. (*Id.*) While she reported that she cleans her bedroom and bathroom, she also stated that cleaning her bedroom can take three days and cleaning her bathroom can take two hours. (*Id.*) She further reported that she is unable to drive if she has a migraine because she is in too much pain and has light sensitivity. (Tr. 282.) She stated that she is unable to pay attention to traffic signs well when she is hypomanic. (*Id.*)

### 2. *Ms. Scott's Testimony*

At the outset of the hearing, the ALJ indicated that 45 minutes were allotted for the administrative hearing. (Tr. 55.) Ms. Scott's counsel would receive 15 minutes for his opening statement. (*Id.*) The ALJ allocated 15 minutes for testimony from Ms. Scott. (*Id.*) Finally, the ALJ allocated 15 minutes testimony from the VE. (*Id.*)

Ms. Scott testified that she has a job coach that has been able to keep her "realistic about her expectations." (Tr. 62) She stated that her biggest problem at work is PTSD, which makes her hypervigilant. (*Id.*) She testified that she worked as a receptionist at the time of the administrative hearing, but her boss had been assigning her more difficult tasks that she felt she was not able to perform. (*See* Tr. 62-63, 66.) She indicated that she used a lot of "brain power," and this negatively affected her stamina. (Tr. 62.)  She does not handle really strong criticism from her boss well and avoids criticism. (Tr. 63.) She reported problems with being absent and late for work as consequences of her mental health conditions. (*Id.*) Specifically, she testified that she was tardy at least three times per week. (*Id.*) She testified that her attendance improved with stimulant medication. (Tr. 63-64.)

Ms. Scott testified that she drives to work and gets off at 1 p.m. (Tr. 64.) Following work, she eats and naps. (*Id.*) When she has the energy, she testified that she "tries" to make important calls and take care of responsibilities. (*Id.*) For example, Ms. Scott indicated that she was trying to get her own apartment and made calls in pursuit of that goal. (Tr. 64-65.) She testified that she and her employment specialist felt that she needed to find a new job. (Tr. 64.) She reported that she wished to stay in the clerical field. (Tr. 65.)

After Ms. Scott provided this testimony, the ALJ indicated that she would like to move to eliciting testimony from the VE. (Tr. 66.) Ms. Scott's counsel requested a supplemental hearing so that he could further develop Ms. Scott's testimony regarding migraines. (Tr. 67.) The ALJ denied this request, stating that she believed that the information in the record was adequate to evaluate the impact of Ms. Scott's migraines on her work duties. (Tr. 67.) Ms. Scott's counsel pointed out that Ms. Scott's testimony did not address her migraines (67-68) and again renewed his request for a supplemental hearing, which the ALJ denied. (Tr. 67.) The ALJ explained that there was a "sufficient amount of information concerning [Ms. Scott's impairments]… provided during the hearing." (Tr. 68.)

### 3. *Vocational Expert's Testimony*

The VE opined that Ms. Scott's past relevant work was employment as a teacher's aide, sandwich maker, hospital food service worker, and cafeteria attendant. (Tr. 68-69.) The ALJ first asked the VE whether an individual with Ms. Scott's age, education, and vocational experience could perform Ms. Scott's past relevant work if limited to lifting and carrying up to 50 pounds occasionally and 25 pounds frequently; never climbing ladders, or scaffolds; not working in unprotected heights; avoiding operating dangerous moving machinery; performing routine type work that does not require strict production quotas for time or quantity; and interacting with

coworker, supervisors, and the general public for brief and superficial work related purposes. (Tr. 69.) The VE opined that this individual could perform all of Ms. Scott's past relevant work except for employment as a teacher's aide. (*Id.*)

The ALJ then asked the VE if the same individual from the first hypothetical – except limited to occasionally interacting with coworkers, supervisors, and the general public for brief and superficial work-related purposes – could perform Ms. Scott's past relevant work. (Tr. 70.) The VE opined that this individual could still perform all of Ms. Scott's past relevant work except for employment as a teacher's aide. (*Id.*)

Ms. Scott's counsel asked the VE what an employer's tolerance would be for tardiness. (*Id.*) The VE opined that an employee could not be absent, including being tardy, more than once per month. (*Id.*) Ms. Scott's counsel then asked if the individual could perform work if she is off task 20% of the workday. (*Id.*) The VE opined that this would be work preclusive. (*Id.*) Ms. Scott's counsel asked the VE if the individual from the ALJ's hypotheticals could perform work if she would be absent or tardy once per week. (*Id.*) The VE opined that this individual would not be able to sustain competitive employment. (*Id.*)

## IV.     ALJ DECISION

The ALJ first found that Ms. Scott meets the insured status requirements of the Social Security Act through September 30, 2025. (Tr. 20.) The ALJ then found that Ms. Scott engaged in substantial gainful activity from December 19, 2018, through June 2019. (Tr. 20.) However, the ALJ also determined that there has been a continuous 12-month period during which Ms. Scott did not engage in substantial gainful activity, and that the findings in the decision address the period during which Ms. Scott did not engage in substantial gainful activity. (Tr. 21.) The ALJ found that Ms. Scott has the following severe impairments: PTSD, bipolar disorder, ADHD combined type,

and migraines. (*Id.*) But the ALJ found that none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 21-25.) The ALJ determined that Ms. Scott has the residual functional capacity ("RFC") to perform work at the medium exertional level, except that she can never climb ladders, ropes and scaffolds; can never work in unprotected heights; must avoid operating dangerous, moving machinery; can perform routine-type work that does not require strict production quotas for time and quantity; and can interact with coworkers, supervisors, and the general public for brief and superficial work-related purposes. (Tr. 25-42.)

## V.     LAW AND ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a

reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

**B.   Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the

national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C. Analysis

As noted above, Ms. Scott raises four assignments of error. First, she says the ALJ deprived Ms. Scott of due process by stopping her counsel's questioning regarding her migraine headaches and denying her request to schedule a supplemental hearing regarding this issue. (ECF No. 6, PageID#1378-80.) Second, she argues that the ALJ erred at Step Three in finding that her migraine headaches did not medically equal Listing 11.02. (*Id.* at PageID#1380-85.) Third, she contends the ALJ did not properly evaluate her alleged pain and fatigue stemming from her migraines, as well as her disabling mental health symptoms, in accordance with SSR 16-3p. (*Id.* at PageID#1385-91.) Finally, Ms. Scott asserts that the ALJ erred at Step Four and Five of the sequential evaluation process because substantial evidence does not support the ALJ's RFC determination that she could perform her past relevant work. (*Id.* at PageID#1392-94.) Because Ms. Scott's argument that the record was not fully developed due to the ALJ's stopping her counsel's examination relating to migraine headaches and refusing to schedule a supplemental hearing on this issue is intertwined with her other arguments regarding the ALJ's approach to her migraine headaches in the decision, I start with Ms. Scott's second assignment of error first. *See, e.g.*, *Lucius R. v. O'Malley*, No. 3:22-cv-01312-MPS, 2024 WL 1200181, at *10 (D. Conn. Jan. 22, 2024) (addressing ALJ's approach

to physical impairment first because, despite full and fair hearing argument being a threshold question, sufficiency of the record was "intertwined" with the ALJ's approach to claimant's physical impairment).

   **1.  *The ALJ did not appropriately evaluate Ms. Scott's migraine headaches under SSR 19-4p.***

Ms. Scott argues that the ALJ erred at Step Three by failing to discuss whether her migraine headaches met or medically equaled Listing 11.02. (ECF No. 6, PageID#1380-85.) The Commissioner asserts that the substantial evidence supports the ALJ's Step Three finding. (ECF No. 8-1, PageID#1423-27.) For the following reasons, Ms. Scott's arguments are well-taken.

At Step Three in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). A claimant is also

25

disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision. *Id.* at 416-17.

### a. Ms. Scott did not forfeit her Listing 11.02 argument.

The Commissioner argues that the ALJ was not required to discuss Listing 11.02 because Ms. Scott's counsel did not argue at the administrative hearing that she met or equaled a Listing, nor did her counsel ask the ALJ to appoint a medical expert prior to the hearing or when she sought review from the Appeals Council. (ECF No. 8-1, PageID#1426.) This argument is not well-taken.

It is true that an ALJ "need not discuss listings that [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). And the Sixth Circuit has held that a claimant's failure to raise a listing argument before the ALJ means the ALJ is not obligated to specifically address that listing in her conclusion. *Wilson v. Comm'r of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015); *Walker v. Barnhart*, 72 F. App'x 355, 357 (6th Cir. 2003) (finding that a claimant who did not assert a disability claim under a specific listing was not entitled to an award of benefits under that listing); *Taylor v. Comm'r of Soc. Sec.*, No. 5:22- cv-00079, 2022 WL 17828336, at *4 (N.D. Ohio Oct. 26, 2022) (finding that a claimant failed to preserve the issue of

26

whether she met Listing 14.05 because she did not mention Listing 14.05 to the ALJ, or at any time during her administrative proceeding, despite being represented by counsel), *report and recommendation adopted*, 2022 WL 17663094 (N.D. Ohio Dec. 14, 2022).

Here, Ms. Scott's counsel did not argue that her headaches met or medically equaled Listing 11.02, though counsel asserted that Ms. Scott's migraines would be found disabling under SSR 96-8p. (*See* Tr. 54-55.) But the ALJ's decision explicitly assessed Ms. Scott's migraine headaches pursuant to SSR 19-4p and discussed whether these headaches met or medically equaled Listing 11.02. (Tr. 21-22.) The case law upon which the Commissioner relies is distinguishable because it does not address a factual scenario where the claimant's counsel fails to raise a specific Listing at an administrative hearing, yet the ALJ explicitly addresses that Listing.

*Haines v. Commissioner of Social Security Administration*, No. 5-22-cv-1161, 2023 WL 3990654, at *2 (N.D. Ohio June 14, 2023) is therefore instructive here. In *Haines*, the plaintiff argued that an ALJ's decision was not supported by substantial evidence because the ALJ failed to explain whether the plaintiff's fibromyalgia met or medically equaled a listing. *Id.* at *2. The magistrate judge in *Haines* agreed and recommended that the court vacate and remand the ALJ's decision to the commission. *Id.* The Commissioner filed an objection to the magistrate judge's report and recommendation, arguing that the claimant forfeited her Listing 14.09D argument because she never raised any specific listing before the ALJ. *Id.* The district court in *Haines* rejected the Commissioner's objection and accepted the report and recommendation based upon its determination, in relevant part, that the plaintiff did not forfeit her right to have her fibromyalgia properly considered at Step Three "simply because her attorney may not have explicitly raised Listing 14.09D during the hearing before the ALJ." *Id.* at *4. Specifically, the district court in *Haines* noted that, despite no "explicit reference to any listing by anyone during the hearing," the

ALJ's final decision addressed several specific listings at Step Three (just not Listing 14.09D). *Id.* (emphasis in original). The *Haines* claimant testified at the hearing about her fibromyalgia and its impact on her daily life, her ability to work, and her medical efforts to deal with it effectively. *Id.* The court held that, even assuming that there had been a forfeiture due to the attorney's failure to mention a specific listing, the Sixth Circuit has recognized that "forfeited issues may in certain circumstances be considered on appeal." *Id.* (citing *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019)).

Here, like *Haines*, there was no explicit reference to any listing during the hearing. *Haines*, 2023 WL 3990654, at *4. Yet, Ms. Scott raised her migraines as one of her claimed reasons for disability. (Tr. 205-09, 267.) And Ms. Scott's counsel argued that Ms. Scott's migraines had a disabling impact at the administrative hearing. (*See* Tr. 54-55). Counsel tried to elicit testimony regarding Ms. Scott's migraines, but the ALJ declined to permit extra time during the hearing or grant a supplemental hearing to receive testimony regarding Ms. Scott's migraines on the basis that the record was allegedly sufficient to make a determination regarding  migraines. (Tr. 67.) Although Ms. Scott was not permitted the opportunity to provide further testimony regarding her migraines, the ALJ stated in her decision that counsel's oral motion "referenced testimony regarding headaches and activities of daily living." (Tr. 18.) And the ALJ also stated that the "detailed information" regarding Ms. Scott's migraines in her function report, among other evidence in the record, would make any testimony on Ms. Scott's migraines "cumulative and repetitive." (*Id.*)

When assessing the circumstances as a whole, the Commissioner does not demonstrate that Ms. Scott forfeited her Listings argument "simply because her attorney may not have explicitly raised Listing [11.02] during the hearing before the ALJ." *Haines*, 2023 WL 3990654, at *4; *see*

*also Wells v. Comm'r of Soc. Sec.*, No. 1:22-CV-01969-BMB, 2023 WL 7923863, at *9 (N.D. Ohio Oct. 13, 2023), *report and recommendation adopted*, 2024 WL 1340187 (N.D. Ohio Mar. 29, 2024) (finding claimant did not forfeit Listing argument despite no explicit reference to any listing by anyone during the hearing where ALJ explicitly addressed the listing and claimant testified about his impairment and its impact on his life).

> **b.  Substantial evidence does not support the ALJ's finding that Ms. Scott's migraine headaches did not meet Listing 11.02's requirements.**

Social Security Ruling ("SSR") 19-4p provides specific guidance on how "primary headache disorders" such as migraines are established and evaluated. *See* SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019). Specifically, SSR 19-4p explains that there is no Step Three listing for primary headache disorder, but these impairments may be found to be medically equivalent to Listing 11.02B. SSR 19-4p, 2019 WL 4169635, at *7. SSR 19-4p instructs that Listing 11.02 (paragraph B or D for dyscognitive seizures) is the "most closely analogous listed impairment" for an MDI of a primary headache disorder. *Id.* In developing SSR 19-4p, the Social Security Administration referred to the third edition of the International Classification of Headache Disorders ("ICHD-3"), which provides classification of headache disorders and diagnostic criteria for scientific, educational, and clinical use. *Id.* at *2. The ICHD-3 diagnostic criteria for migraine without aura include pain lasting 4 to 72 hours (untreated or unsuccessfully treated) and at least two of four characteristics, *e.g.,* unilateral location, pulsating quality, moderate or severe pain intensity, or aggravation by or causing avoidance of routine physical activity). *Id.* at *5. Additionally, during the headache, the individual must experience at least one of the following: nausea, vomiting, photophobia, or phonophobia. *Id.*

Regarding Listing 11.02, SSR 19-4p explains, in relevant part:

While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her [medically determinable impairment](s) medically equals the listing.

Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [accepted medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.* at *7.

Here, the ALJ determined at Step 2 that Ms. Scott suffered from the severe impairment of migraines. (Tr. 21.) Yet, the ALJ determined at Step 3 that Ms. Scott's migraines did not meet or medically equal the requirements of Listing 11.02(B) or (D). (Tr. 21-25.)

Viewing at the evidence as a whole, the ALJ's conclusion does not appear to be supported by substantial evidence because it is unclear how the ALJ reached the conclusion that Ms. Scott's migraine headaches did not rise to the documented frequency and severity required by the Listing. As stated above, SSR 19-4p instructs that one of the criteria relevant to medical equivalence with Listing 11.02B is the frequency of headache events. Regarding Listing 11.02B, migraine headaches rise to a Listing level when they are "occurring at least once a week for at least 3 consecutive months." *See* SSR 19-4p, 2019 WL 4169635, at *7.

Here, the ALJ concluded that "[t]he evidence does not support the conclusion that [Ms. Scott's] headaches reach listing-level severity." (Tr. 22.) Regarding frequency, the ALJ stated that

the treatment records "offer[] little support for her allegations that migraine headaches occur with such frequency and intensity as to render her disabled." (Tr. 27.) The Commissioner asserts that Ms. Scott does not meet her burden in demonstrating that her headaches met the Listing's frequency requirements. Specifically, the Commissioner focuses on two specific occasions where Ms. Scott reported that her headaches dropped from 10 days a month to three days a month (Tr. 497), and where she reported five headache days a month (Tr. 498) without specifying "whether [her headaches] occurred weekly, or how long it took them to subside." (ECF No. 8-1, PageID#1426-27.)

But the ALJ appears to have ignored contradictory information in the record that suggests Ms. Scott's migraine headaches rose to the severity and frequency that meets Listing 11.02. Notably, some of the criteria mentioned in the treatment notes align with the stated ICHD-3 criteria for migraine without aura, *i.e.*, pain lasting 4 to 72 hours (untreated or unsuccessfully treated); at least two of four characteristics (unilateral location, pulsating quality, moderate or severe pain intensity, or aggravation by or causing avoidance of routine physical activity); and the experience of either nausea, vomiting, photophobia, or phonophobia during one's headache. SSR 19-4p, 2019 WL 4169635, at *5.

For example, the ALJ observed that on May 10, 2022, Ms. Scott reported 10 headache days a month and that Excedrin, a non-prescription medication, was sometime effective but her headaches were worse. (Tr. 1139.) As a result, PA Grenfell noted that she intended to get a preauthorization for Ms. Scott to use Fremanezumab. (Tr. 1144.) PA Grenfell further noted that Ms. Scott's migraine headaches met the American Headache Society criteria for treatment with this injection because Ms. Scott has "[e]pisodic [m]igraine which occurs up to 14 days a month for 4 or more hours." (*Id*.) Significantly, PA Grenfell specifically noted that Ms. Scott "has **10**

31

***migraines per month***, lasting 4 or more hours[] associated with photophobia, phonophobia, nausea, neck pain ***for three or months***." (*Id.*) (emphasis added).

And as Ms. Scott correctly points out, the rest of the notes from the same May 2022 treatment note set forth a description of migraine headaches that also appears to align with the ICDH-3 criteria used in developing SSR 19-4p criteria. Notably, Ms. Scott reported photophobia, phonophobia, and nausea with her migraine headaches. (Tr. 1140.) Her migraine headache was reported to be in the occipital and temporal regions accompanied by pressure and throbbing. (*Id.*) These headaches lasted 48 hours with treatment. (*Id.*) As a result of these headaches, she missed six days of work in the last month. (*Id.*)  Finally, PA Grenfell also noted that preventive medications such as Topamax, a prescription medication for migraines, "ha[s] been tried for 3 or more months" without benefit or discontinued due to side effects. (*Id.*)

Ms. Scott has demonstrated that the record raises a substantial question about her ability to satisfy Listing 11.02. And there is no evidence that the ALJ's decision fully considered all the evidence pertaining to the frequency and severity of Ms. Scott's migraine headaches. *See Dillard v. Comm'r of Soc. Sec.*, No. 3:23-cv-00619-JJH, 2024 WL 3205927, at *13 (N.D. Ohio Feb. 15, 2024), *report and recommendation adopted*, 2024 WL 3201110 (N.D. Ohio June 27, 2024) (finding claimant raised substantial question that her migraine headaches met Listing 11.02(B) where there was "no indication" the ALJ fully considered SSR 19-4p criteria relevant to medical equivalence); *see also Jandt v. Saul*, No. 1:20-CV-00045-HBB, 2021 WL 467200, at *10 (W.D. Ky. Feb. 9, 2021). Thus, the ALJ's determination of whether Ms. Scott's migraine headaches met Listing 11.02 is not supported by substantial evidence.

### 2. *The ALJ did not afford Ms. Scott a full and fair hearing.*

Ms. Scott argues that the ALJ denied Ms. Scott's procedural due process rights to a full and fair hearing by imposing a time constraint on her testimony and refusing to schedule a supplemental hearing on this issue, which she alleges prevented her from explaining how her migraines affected her ability to work. (ECF No. 6, PageID#1378-80.) She contends that the ALJ's actions were in violation of her Fifth Amendment rights, and the *Hearings, Appeals and Litigation Law Manual* ("HALLEX") I-2-6-60 and I-2-6-80. (*Id.*) The Commissioner disagrees. (ECF No. 8-1, PageID#1421-23.)

The Due Process Clause of the Fifth Amendment establishes that no deprivation of life, liberty, or property will occur without notice and an opportunity for a fair hearing. *Flatford v. Chater*, 93 F.3d 1296, 1303 (6th Cir. 1996). Because social security claimants have a property benefit for which they hope to qualify, this element is readily satisfied. *Id.* at 1304; *see also Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("The interest of an individual in continued receipt of [social security benefits] is a statutorily created 'property' interest protected by the Fifth Amendment."). To prevail on a due process claim, the claimant must establish that the United States attempts to deprive her of a protected interest. *Flatford*, 93 F.3d at 1303-04. Due process also requires a Social Security hearing to be "full and fair," *id.* at 1305 (citing *Richardson v. Perales*, 402 U.S. 389, 400-01 (1971)), meaning that claimants should be given a "meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349.

To the extent that Ms. Scott relies on HALLEX to establish a due process violation, this argument is unavailing. Although HALLEX describes policies ALJs should follow when conducting hearings and reviewing a claimant's case, HALLEX's procedural guidance is not binding on this court. *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008); *see also*

*Robberts v. Comm'r of Soc. Sec.*, No. 2:18-cv-541, 2019 WL 4023549, at *7 (S.D. Ohio Aug. 26, 2019) ("Importantly, HALLEX is an internal guidance tool that does not have the force of law…Indeed, HALLEX does not impose judicially enforceable duties on either the ALJ or this Court."); *Alilovic v. Astrue*, No. 1:12-cv-323, 2012 WL 5611077, at *7 (N.D. Ohio Nov. 15, 2012) (HALLEX "is not published in either the Federal Register or the Code of [Federal Regulations] and does not have the force of law.")  And procedural due process rights do not arise from HALLEX violations alone. *See Eboch v. Comm'r of Soc. Sec.*, No. 5:12-cv-649, 2012 WL 7809080, at *4 (N.D. Ohio Dec. 13, 2012), *report and recommendation adopted*, 2013 WL 1284353 (N.D. Ohio Mar. 27, 2014) ("[A]gency procedures set forth in HALLEX may embody, but do not *create* federal due process rights for claimants.") (emphasis in original); *see also Lawrence v. Colvin*, No. 3:13-032-DCR, 2014 WL 640990, at *4 (E.D. Ky. Feb. 18, 2014), *aff'd sub nom. Lawrence v. Comm'r of Soc. Sec.*, 591 F. App'x 470 (6th Cir. 2015) (collecting cases). Indeed, "[n]o circuit has held that…HALLEX creates *constitutional rights* because, of course, only the Constitution, not an agency's rules or procedures, is the source of such rights." *Dukes v. Comm'r of Soc. Sec.*, No. 1:10-cv-436, 2011 WL 4374557, at *9 (W.D. Mich. Sept. 19, 2011) (quoting *Davenport v. Astrue*, 417 F. App'x 544, 547-48 (7th Cir. 2011) (emphasis in original)).

But Ms. Scott appears to intertwine her argument that her procedural due process rights were violated with her argument that she was denied a "full and fair" hearing because the ALJ refused to allow her counsel to continue his examination regarding her migraine headaches and/or schedule a supplemental hearing so that she could provide testimony on this issue. (*See* ECF No. 6, PageID#1379.) Specifically, she argues that the ALJ's actions "deprived [her] of presenting a complete picture of how her impairments affected her ability to engage in substantial gainful activity on a full-time and sustained basis." (*Id.* at PageID#1380.)

34

The Sixth Circuit has held that the ALJ bears the burden to fully develop the record, and the failure to do so may deny the claimant a full and fair hearing. *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1052 (6th Cir. 1982). There is, however, no bright-line test to determine if an ALJ has met the duty to develop the record fully it must be determined on a case-by-case basis. *Id.* at 1052; *see also Young v. Comm'r of Soc. Sec.*, No. 5:20-CV-01152-DAC, 2021 WL 3190826, at *8 (N.D. Ohio July 28, 2021).

Ms. Scott cites no authority for the proposition that an ALJ violates due process principles merely because the ALJ placed limits on her testimony. (*See* ECF No. 6, PageID#1379 (asserting that the ALJ had "arbitrarily allotted 15 minutes for testimony")). Due process is not a "technical conception with a fixed content unrelated to time, place and circumstances." *Mathews*, 424 U.S. at 334 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, (1972)). A plaintiff does not have an absolute right to present unlimited evidence; she is subject to the due process concept of reasonableness. *Liu v. U.S. Dep't of Justice*, 13 F.3d 1175, 1177 (8th Cir.1994)*see also N.L.R.B. v. Midwestern Pers. Servs., Inc.*, 508, F.3d 418, 427 (7th Cir.2007) (finding that ALJ did not unreasonably restrict cumulative testimony). In the social security context, it is appropriate for an ALJ to reasonably limit a plaintiff's testimony or evidence. *See Pate v. Astrue*, No. H-08-249, 2009 WL 4825206, at *9 (S.D. Tex. Dec. 8, 2009) (finding that any limits imposed by the ALJ were reasonable and did not infringe on plaintiff's due process rights because the record showed that counsel could question plaintiff and VE).

Courts have held that an ALJ may place reasonable limitations on testimony if the claimant was afforded at least some opportunity to provide testimony on the disputed issues. For example,

in *Chase D. v. Kijakazi*, the ALJ stated at the outset that the hearing would be limited to "30-40 minutes," and the plaintiff challenged this limitation on appeal to the U.S. District Court for the District of Minnesota. No. 20-cv-1292 (ADM) (TNL), 2022 WL 479357, at *6-7 (D. Minn. Jan. 31, 2022), *report and recommendation adopted*, 2022 WL 484986 (D. Minn. Feb. 16, 2022). The *Chase D.* court held that the requirements of due process had been satisfied by a single, 38-minute hearing; the opportunity to request a second, supplemental hearing; and the opportunity to "submit a closing statement to the ALJ in writing." *Id.* at *8. In *Carolyn K. v. Kijakazi*, an ALJ likewise imposed time limitations at the outset of a hearing, and the plaintiff also challenged the limitation on appeal, arguing that she had been "forced to shorten her own testimony." No. 20-cv-1394 (NEB) (LIB), 2022 WL 543076, at *8 (D. Minn. Jan. 31, 2022), *report and recommendation adopted*, 2022 WL 542418 (D. Minn. Feb. 23, 2022). The *Carolyn K.* court held that the plaintiff provided substantial testimony to develop a full and fair record within the 41-minute hearing because the plaintiff "testif[ied] about her subjective complaints, how her symptoms prevented her from working, her past employment and the activities she performed therein." *Id.* at *7. And in *Pate v. Astrue*, No. H-08-249, 2009 WL 4825206, at *9 (S.D Tex. Dec. 8, 2009), the district court found that the ALJ did not violate claimant's procedural due process rights when limiting testimony because the claimant's counsel did not object to the time limitation;  the record showed that claimant's counsel questioned her "at some length about her impairments, limitations, and difficulties in school"; and the claimant had not "alleged or shown that counsel was unable to present certain testimony or evidence or that the ALJ's consideration of [the claimant's] impairments was hindered by counsel's inability to question the claimant at more length."

Here, the ALJ explained that the hearing would be 45 minutes in length, with 15 minutes allotted to the claimant's testimony. (Tr. 55.) While Ms. Scott's counsel elicited testimony from

Ms. Scott, the testimony primarily related to Ms. Scott's mental impairments – not her migraines. (*See generally* Tr. 62-66.) And the ALJ denied Ms. Scott's counsel's requests to conduct further questioning about her migraine headaches or to schedule a supplemental hearing on this issue.(Tr. 67-68.)

Unlike *Chase D.*, *Carolyn K.,* and *Pate,* the limitations imposed by the ALJ here were not reasonable because the ALJ did not allow Ms. Scott a fair opportunity to testify regarding her subjective complaints related to her migraine headaches and how these symptoms prevented her from working. In addition, unlike the counsel in *Pate*, Ms. Scott's counsel objected to the ALJ's time limitation and requested a supplemental hearing, which the ALJ denied. *See* (Tr. 67 (counsel disagreeing with ALJ's denial of supplemental hearing request, stating that he was "going to have to appeal if [there was an] unfavorable decision," and asserting that claimant's testimony dealt with her mental health impairments, not her migraines)). Moreover, Ms. Scott can show prejudice resulting from the ALJ's actions because, as discussed above, the ALJ's determination that Ms. Scott's migraines did not satisfy Listing 11.02 is not supported by substantial evidence. *Cf. Karst Robbins Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 969 F.3d 316, 329 (6th Cir. 2020) ("[A] party must show that it was prejudiced in order to succeed on a due process claim."). Thus, I recommend remand so that the ALJ may afford Ms. Scott a full and fair hearing with a reasonable opportunity to testify about her migraine headaches.

### 3. *While substantial evidence does not support the ALJ's SSR 16-3p evaluation of Ms. Scott's subjective complaints regarding her migraines, Ms. Scott fails to establish clear error in the ALJ's analysis of her subjective mental health symptoms.*

Ms. Scott argues that the ALJ erred in evaluating her migraine and mental health symptoms under SSR 16-3p. (ECF No. 6, PageID#1385-91.) In support, she cites testimony and evidence from her medical providers that she argues are consistent with her reported symptoms. (*Id.*) She

contends that the ALJ provided a boilerplate paragraph in finding that her subjective reports were inconsistent and fails to explain how the ALJ reached a decision. (*Id.* at PageID#1389.) The Commissioner disagrees. (ECF No. 8-1, PageID#1427-32.) While Ms. Scott establishes error regarding the ALJ's evaluation of her migraine complaints, her arguments regarding the ALJ's evaluation of her mental health complaints fail.

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Then, the ALJ must evaluate the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources (such as family and friends). *Id.* An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496,

508 (6th Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007); see also SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id.* (internal quotations and citations omitted).

For the reasons set forth above, I recommend that this matter be remanded because the ALJ did not properly evaluate Ms. Scott's migraine headaches under Listing 11.02 and SSR 19-4p. The ALJ's evaluation of the evidence on remand may impact her analysis of Ms. Scott's subjective complaints regarding her migraine headaches. *Gula v. Comm'r of Soc. Sec.*, No. 5:23-cv-00417-JRA, 2024 WL 585530, at *11 (N.D. Ohio Jan. 25, 2024), *report and recommendation adopted*, 2024 WL 580979 (N.D. Ohio Feb. 13, 2024).

However, Ms. Scott fails to establish clear error in the ALJ's analysis of her subjective mental health symptoms. That is because the ALJ provided clear, discernible reasons for why Ms. Scott's allegations regarding her mental health impairments were not consistent with the record evidence. Specifically, the ALJ detailed over the course of 11 pages that Ms. Scott's mental status examinations and evaluations consistently showed that Ms. Scott's abnormal findings mostly

related to her mood and affect (Tr. 28-39; *see, e.g.*, Tr. 353, 370, 402-03, 468-69, 656-57, 760-61, 822, 844-45, 883-86, 925 1080, 1125, 1336, 1348), with occasional notations regarding passive thoughts of death (*see, e.g.*, Tr. 353, 457, 632, 721), tangential thinking (Tr. 1063, 1075, 1080, 1083, 1086, 1092, 1095), and impaired judgment and/or insight (Tr. 593, 604, 892.) Ms. Scott's other mental status findings were usually within normal limits, *i.e.*, appearance, behavior, attention, concentration, thought processes, memory, and cognition. (*See, e.g.*, Tr. 359-60, 372-75, 502-03, 721-25, 730-42, 857-58, 932, 1095, 1101, 1332, 1336, 1340, 1348.)

The ALJ also found that Ms. Scott's daily activities were inconsistent with her alleged limitations due to her mental impairments. For example, the ALJ observed that Ms. Scott reported activities such as working part-time, attending classes for an associate's degree, banking, playing video games, watching movies, socializing with friends, and traveling out of town. (Tr. 26; *see* Tr. 41-42, 283, 515, 564, 583, 735-36, 761, 846, 902, 934, 1023, 1055, 1347.) Daily activities are an appropriate factor that an ALJ may use in assessing the consistency of a claimant's subjective complaints. *See* 20 C.F.R. § 404.1529(c)(3)(1); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

After assessing the alleged limitations stemming from Ms. Scott's mental impairments, the ALJ then explained how she factored Ms. Scott's subjective complaints into her mental RFC determination. The ALJ did not fully accept Ms. Scott's complaints of disabling symptoms due to her mental impairments, but she did credit them to some extent. (Tr. 42.) Specifically, the ALJ found that:

> As for her mental health symptoms, once she was more compliant with taking her medications and completed an intensive outpatient program, her symptoms became

more manageable. While she presented with depressive symptoms, the fact remained that her mental abilities were not so compromised as to render her completely unable to engage in any work activities. The vast majority of her counseling and therapy sessions document her as stable with intact cognition, clear thought processes and tight associations. She was cooperative, engaged, used clear language, no SI/HI, no hallucinations, and no paranoia. In 2022, she reported improved attention symptoms and good memory when she started a medication for ADHD. She reduced alcohol consumption and marijuana usage. (For example, Exs. 10F/ 12F and 14F) Therefore, this evidence supports the conclusion that the claimant retains the functional abilities to engage in work that is routine in nature and does not require strict production quotas. She can interact with her co-workers, supervisors and the general public for brief, work related purposes that do not require arbitration or directing the work of others.

(*Id.*)

Here, the ALJ complied with SSR 16-3p in evaluating Ms. Scott's complaints of disabling symptoms and limitations with respect to her mental health impairments. In doing so, the ALJ gave specific reasons for the weight she assigned to Ms. Scott's statements and drew a logical bridge between her findings and her conclusion. *See* SSR 16-3p, 2017 WL 5180304, at *10 (an ALJ must give "specific reasons" for the weight she assigns to a claimant's statements).

Ms. Scott highlights portions of the record that she argues support her subjective complaints and substantiate further limitations in her RFC for her mental health impairments. But this approach does not satisfy the substantial evidence standard. It is not a reviewing court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "Even if evidence could support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997.) That is because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker*, 730 F.2d at 1150).

In sum, the ALJ did not err in assessing Ms. Scott's complaints regarding her mental health impairments. However, I recommend remand for further consideration of Ms. Scott's complaints regarding her migraine headaches for the reasons set forth at length above.

### 4. *Substantial evidence does not support the ALJ's Step Four finding that Ms. Scott could perform her past relevant work.*

Finally, Ms. Scott contends that substantial evidence does not support the ALJ's Step Four finding that she could perform her past relevant work. (ECF No. 6, PageID#1392-94.) At Step Four of the sequential evaluation process, an ALJ compares her RFC assessment with the physical and mental demands of the claimant's past relevant work to see if the claimant can perform that work as she actually performed it *or* as it is generally performed in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). In doing so, the AJ may use the services of VEs, or rely on other sources such as the *Dictionary of Occupational Titles*. *See* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). If the ALJ finds, based on any of these resources, that the claimant can perform her past relevant work, she findings the claimant not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560(b), 416.920(a)(4)(iv), 416.960(b).

Because I recommend remand on the basis that the ALJ did not properly consider whether Ms. Scott's migraine headaches met Listing 11.02, I cannot find that substantial evidence supports the ALJ's RFC finding at Step Four. Further consideration of Ms. Scott's migraine headaches may alter the ALJ's Step Four determination. Thus, I recommend remand so that the ALJ may further consider whether Ms. Scott is able to perform her past relevant work in light of her migraines.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court VACATE and REMAND the Commissioner's final decision for further proceedings consistent with this Report and Recommendation.

Dated: July 15, 2024                         */s Jennifer Dowdell Armstrong*
                                             Jennifer Dowdell Armstrong
                                             U.S. Magistrate Judge

## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes

judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).